NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | : | |
|---|---|---|
| LISA MIRABILE | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 07-3102 (JAP) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | |
| | : | |
| Defendant, | : | |
| | : | |

PISANO, District Judge:

Before the Court is Lisa Mirabile's ("Plaintiff") appeal from the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's request for disability insurance benefits ("DIB") and supplemental security income ("SSI"). The Court has jurisdiction to review this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3) and renders its decision without oral argument. *See* Fed. R. Civ. P. 78. For the reasons expressed below, the record provides substantial evidence supporting the Commissioner's decision that Plaintiff was not disabled. Accordingly, the Court affirms.

I. BACKGROUND

A. Procedural History

Plaintiff filed applications for DIB and SSI on October 27, 2004, alleging severe and disabling depression and anxiety. Both applications allege a disability onset date of April 1,

1

2004.  Plaintiff's claims were denied by the agency initially on January 31, 2005, and again on reconsideration on April 6, 2005.  Plaintiff filed a request for a hearing before an administrative law judge, and a hearing was held on August 2, 2006, before Administrative Law Judge John M. Farley ("ALJ").  The ALJ issued a decision on December 21, 2006, denying Plaintiff's application.  Plaintiff submitted a request for review by the Social Security Appeals Council on January 9, 2007, which was denied May 5, 2007.  This action followed.

**B. Factual History**

Plaintiff was born March 2, 1967 and has an eleventh grade education.  She had previous employment in sales of motorcycles from 1992 through 1999 and sales of women's clothing from 1988 to 1990.  In a Function Report dated November 30, 2004, Plaintiff reported that she lived with and cared for her five-year-old daughter.

The record shows that from March 2, 2004, to March 9, 2004, Plaintiff was hospitalized at Riverview Medical Center ("Riverview") when she "became depressed and made suicidal attempts."  Administrative Record ("R.") 78.  Dr. Mohammed Hyderi conducted a psychiatric exam of Plaintiff and diagnosed Plaintiff for Axis I (DSM-IV) as polysubstance dependent and suffering from "bipolar disorder mixed without psychotic features."  R. 79.  No diagnosis was made for Axis II, iron deficiency was diagnosed at Axis III, and "significant substance dependence and financial pressures" was the diagnosis for Axis IV.  Plaintiff was referred to CPC Behavioral Healthcare ("CPC") for intensive outpatient treatment.

A psychiatrist from CPC examined Plaintiff on April 7, 2004, and noted that Plaintiff reported symptoms of depression and anxiety.  R. 94.  The report also notes Plaintiff's history

with marijuana and cocaine use, and that Plaintiff daughter was taken from her in 2000 when drugs were found in her blood. R. 95. After Plaintiff spent three months in a drug program, her daughter was returned to her. *Id.* Plaintiff reported to the CPC doctor that she had not been using drugs for a period of time (exactly how long is unclear) until February 29, 2004, a few days prior to her admission to Riverview, when she smoked marijuana. *Id.* The CPC psychiatrist diagnosed depressive disorder NOS, bipolar disorder-mixed episode, marijuana dependance and cocaine abuse. According to the report, an intensive outpatient program, individual therapy and medication was recommended.

     A CPC Patient Admission report shows that Plaintiff was admitted to CPC's intensive outpatient program as a "Alcohol/Drug Abuser" on March 15, 2004. The report indicates that Plaintiff's "primary" drug use consisted of smoking marijuana/hashish "daily," and a "secondary" drug use consisted of smoking crack "less than weekly." R. 135. It appears from a Discharge Report that Plaintiff was discharged from CPC on November 12, 2004, (R. 137, R. 181) and had been provided with group and individual counseling, self-help through Alcoholics Anonymous and Narcotics/Cocaine Anonymous, and case management for child protective services. This report shows that while Plaintiff was in the CPC program, drug urine screens were conducted nine times, and three of Plaintiff's tests came back positive for drugs. R. 140  According to the report, Plaintiff was discharged because her treatment plan was completed and "[n]o continuing substance abuse treatment [was] needed." R. 138. The report further notes that the "significant problems and conditions present at admission or identified during treatment" were a "mental health problem" and that Plaintiff was a "victim of physical abuse/neglect." *Id.*

In December 2004 a consultative evaluation was performed by Dr. Hugh Moore. R. 100-03. Dr. Moore noted that Plaintiff complained of symptoms of depression and anxiety, and that past treatment had improved the symptoms but that some symptoms still occurred. It was noted that Plaintiff stopped taking her psychiatric medications two months prior to meeting with Dr. Moore. Plaintiff reported to Dr. Moore that she used marijuana until her admission to Riverview in 2004 and that she completed a program at CPC in 2004.

Dr. Moore's mental status examination found Plaintiff to be cooperative, and found her "manner of relating, social skills and overall presentation to be adequate." R. 101. She was appropriately dressed, her personal hygiene and grooming was good and her eye contact was appropriate. Her speech was fluent and her thought processes were coherent. Plaintiff's mood was calm and she appeared relaxed and comfortable. Her affect was congruent and her attention and concentration was intact. Dr. Moore found her memory skills to be intact and estimated her intellectual functioning to be average. He found her insight to be poor and her judgment fair.

Plaintiff reported to Dr. Moore that, on a daily basis, she was able to dress, bathe and groom herself, cook and prepare food, do general cleaning, laundry, and shopping, manage money, drive, and take public transportation. She reported that she got along well with friends and family, and spent her days doing chores and watching television. Dr. Moore found the results of his examination to be consistent with psychiatric problems, but found such problems were not "significant enough to interfere with the [Plaintiff's] ability to function on a daily basis." R. 102. Dr. Moore's diagnosis for Axis I was mood disorder NOS and cannabis abuse that was in remission. Dr. Moore also noted that he could not rule out malingering. For Axis

II, Dr. Moore diagnosed borderline personality disorder.  R. 103.

At an unspecified time in 2005 Plaintiff returned to CPC.  R. 181.  Plaintiff was discharged on July 13, 2006.  There appears to be little information in the record regarding the treatment Plaintiff received, as most of the information contained in the Discharge Report (R. 137-140) relates to Plaintiff's treatment in 2004 (*see* R. 137 ("Date Discharge Data Entered: 11/12/2004")).

In early 2006 Plaintiff began treatment at Gateway Day Treatment Program.  A psychiatric evaluation done on February 2, 2006 notes that her "Chief Complaint" is depression and polysubstance abuse.  R. 143.  While much of the details contained in this handwritten evaluation are illegible, the diagnoses set forth are bipolar disorder and polysubstance abuse.  Further, the DSM-IV diagnosis for Axis IV is "chronic substance use."  It was noted that Plaintiff was on several medications.  R. 144.

A follow-up psychiatric report from Gateway dated July 13, 2006, which is the same day that Plaintiff was discharged from her second program at CPC, is similarly handwritten and largely illegible, but it can be seen that at this time Plaintiff was described as "well-groomed," in a "good" mood, her speech coherent and her disposition "appropriate."  R. 149.

## II. DISCUSSION

### A.   *Standard of Review*

The standard under which the District Court reviews an ALJ decision is whether there is substantial evidence in the record to support the ALJ's decision.  *See* 42 U.S.C. § 405(g); *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  "[M]ore than a mere scintilla," substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate

to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The inquiry is not whether the reviewing court would have made the same determination, but, rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988). Substantial evidence, therefore, may be slightly less than a preponderance. *See Hanusiewicz v. Bowen*, 678 F. Supp. 474, 476 (D.N.J. 1988).

The reviewing court, however, does have a duty to review the evidence in its totality. *See Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). As such, "a court must take into account whatever in the record fairly detracts from its weight." *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (internal quotations omitted). The Commissioner has a corresponding duty to facilitate the court's review: "[w]here the [Commissioner] is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence." *Ogden v. Bowen*, 677 F. Supp. 273, 278 (M.D. Pa. 1987). As the Third Circuit has instructed, a full explanation of the Commissioner's reasoning is essential to meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978). Nonetheless, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).

  **B.**   *Establishing a Disability Under the Act*

Plaintiff's eligibility for DIB and SSI is governed by 42 U.S.C. §§ 423 and 1382. A

claimant is eligible for DIB and SSI if she meets the disability period requirements of 42 U.S.C. § 416(I), and demonstrates that she is disabled based on an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person is disabled for these purposes if his or her physical or mental impairments are "of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Social Security regulations set forth a five-step, sequential evaluation procedure to determine whether a claimant is disabled. *See* 20 C.F.R. § 404.1520. For the first two steps, the claimant must establish (1) that she has not engaged in "substantial gainful activity" since the onset of her alleged disability, and (2) that she suffers from a "severe impairment" or "combination of impairments." 20 C.F.R. § 404.1520(a)-(c). Given that a claimant bears the burden of establishing these first two requirements, the failure to meet this burden automatically results in a denial of benefits. *See Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987).

If the claimant satisfies her initial burdens, the third step requires that she provide evidence that her impairment is equal to or exceeds one of those impairments listed in Appendix 1 of the regulations ("Listing of Impairments"). *See* 20 C.F.R. § 404.1520(d). Upon such a showing, she is presumed to be disabled and is automatically entitled to disability benefits. *Id*.

If she cannot so demonstrate, the benefit eligibility analysis proceeds to steps four and five.

The fourth step of the analysis focuses on whether the claimant's "residual functional capacity" sufficiently permits her to resume her previous employment. *See* 20 C.F.R. § 404.1520(e). "Residual functional capacity" is defined as "that which an individual is still able to do despite limitations caused by his or her impairments." 20 C.F.R. § 404.1520(e). If the claimant is found to be capable of returning to her previous line of work, then she is not "disabled" and not entitled to disability benefits. 20 C.F.R. § 404.1520(e). Should the claimant be unable to return to her previous work, the analysis proceeds to step five. To determine the physical exertion requirements of work, jobs are classified as sedentary, light, medium, heavy, and very heavy.

At step five, the burden shifts to the Commissioner to demonstrate that the claimant can perform other substantial gainful work. *See* C.F.R. § 404.1520(f). If the Commissioner cannot satisfy this burden, the claimant shall receive social security benefits. *Yuckert*, 482 U.S. at 146-47 n.5.

In cases involving drug or alcohol addiction, "[a]n individual shall not be considered to be disabled ... if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). The need for this materiality determination arises in situations like the instant case where the ALJ determines that the claimant is disabled and has a drug or alcohol addiction . 20 C.F.R. §§ 404.1535(a), 416.935(a). Under the Social Security Administration's regulations, the "key factor" in determining whether a claimant's alcohol or drug abuse is a material contributing factor to the claimant's disability is "whether we would still find [the

claimant] disabled if [he or she] stopped using drugs or alcohol." 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).  Although the issue has not been directly addressed by the Third Circuit, other circuit courts have held that it is the Plaintiff that bears the burden of proving that his or her drug addiction or alcoholism is not a contributing factor material to the disability determination.  *See Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir.2007); *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir.2003); *Doughty v. Apfel*, 245 F.3d 1274, 1281 (11th Cir.2001); *Brown v. Apfel*, 192 F.3d 492, 498 (5th Cir.1999).

    C.  ***The ALJ's Decision***

The ALJ applied the facts from the record to the five-step analysis to conclude that Plaintiff is not entitled to either DIB or SSI.  Initially, at the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since April 1, 2003.  R. 18.  Turning to step two, the ALJ found that Plaintiff suffered from two severe impairments: bipolar disorder and substance addiction disorder.  *Id.*  Upon reaching the third step, the ALJ found that Plaintiff demonstrated that those impairments, including the substance abuse disorder, met sections 12.04A(3), B(1,2) and 12.09B of the listed impairments in the Listing of Impairments.

However, the ALJ further found that absent the substance use, no listing would be met. The ALJ reached this conclusion "because the claimant has not had repeated episodes of decompensation of extended duration or restriction of activities of daily living or difficulties in maintaining social functioning, concentration, persistence and pace at more than a mild level of severity when she has been sober."  R. 18.

Continuing on to step four, the ALJ determined that if Plaintiff "stopped the substance use, [she] would have the residual functional capacity to perform the basis mental demands of

9

competitive, remunerative work on a sustained basis." R.18.  In making this determination, the ALJ first noted that he found that Plaintiff's statements about the limiting effects of her symptoms were not entirely credible.  The ALJ also relied upon the records from Riverview, which stated that "when she is in the good, sober periods she is very successful and thoughtful and productive." R. 79.  Pointing also to the consultative exam performed by Dr. Moore, the CPC discharge report and the records from Gateway, the ALJ concluded that "[t]he record shows that when the claimant is sober, her mental status examinations and activities of daily living are essential normal." R. 19.

Based on his findings regarding Plaintiff's residual functional capacity, the ALJ concluded that Plaintiff would be able to perform past relevant work as a bookkeeper, parts manager and salesperson.  In particular, the ALJ referred to Dr. Moore's opinion "that [Plaintiff's] psychiatric problems did not appear significant enough to interfere with her ability to function on a daily basis." R. 19.

### D.  *The ALJ's Decision is Supported by the Substantial Evidence*

Plaintiff raises two main challenges to the ALJ's decision: (1) Plaintiff argues that there is no evidence in the record that "she has a current, or at any time during the disability period under consideration, substance use disorder," and, in any event, the ALJ failed to properly determine that her drug use was material to her mental impairments, Pl. Brf. at 20; and (2) Plaintiff's residual functional capacity prevented her from returning to past relevant work, Pl. Brf. at 21.  The Court finds Plaintiff's arguments to be without merit.

As an initial matter, the Court finds that the ALJ did not err in finding that Plaintiff had a substance use disorder.  Indeed, the record is replete with evidence of Plaintiff's substance use

10

disorder during the relevant time frame.  Dr. Hyderi from Riverview diagnosed Plaintiff as, among other things, "polysubstance dependent" for Axis I and noted "significant substance dependence" under Axis IV  R. 79.  From Riverview, Plaintiff was referred to CPC, where the the March 15, 2004 admission report from CPC notes that Plaintiff was admitted as an "Alcohol/Drug Abuser."  The admission report further notes that Plaintiff had "been treated in an emergency room for alcohol or drug problems" within the previous 30 days.  R. 133, 136.  Additionally, the psychiatric assessment done at CPC diagnosed "marijuana dependance" and "cocaine abuse."  R. 98.  The discharge report from CPC notes that, during Plaintiff's time in the program there, urine tests were done on Plaintiff nine times and three of these tests came back positive for drugs.  R. 140.  In February 2006, a Psychiatric Evaluation from Gateway Day Treatment Program notes that one of Plaintiff's "Chief Complaints" was "polysubstance abuse/dep[endence]" and the evaluation from Gateway sets forth a provisional DSM-IV diagnosis and notes, among other things, "polysubstance abuse/dep[endence]" for Axis I and "chronic substance use" for Axis IV.  R. 146.

       Finding evidence of substance use, and further finding that Plaintiff's impairments were disabling when the substance abuse was considered, the ALJ was required to determine whether Plaintiff's substance use was "a contributing factor material to the ... determination that the individual is disabled."  42 U.S.C. § 423(d)(2)(C).  With regard to making this determination, the Social Security Administration ("SAA") advises adjudicators that "[t]he most useful evidence [when making a materiality determination] is that relating to a period when the individual was not using drugs/alcohol."  Social Security Administration, Questions and Answers Concerning DAA from the 07/02/96 Teleconference, No. EM-96200 (Aug. 30, 1996).

Here, the ALJ found that, absent substance use, Plaintiff had not met any listing because she had "not had any repeated episodes of decompensation of extended duration or restriction of activities of daily living or difficulties in maintaining social functioning, concentration, persistence and pace at more than a mild level of severity when she has been sober." R. 18. He further found that if Plaintiff stopped the substance use, she would have the residual functional capacity "to perform the basic mental demands of competitive, remunerative work on a sustained basis." R. 18. The Court finds these conclusions to be supported by the substantial evidence.

In making these findings, the ALJ, consistent with the SAA's guidelines, examined evidence relating to periods where Plaintiff was not using drugs. The ALJ referenced the records from Riverview, in which Dr. Hyderi noted that "when [Plaintiff] is in the good, sober periods, she is very successful and thoughtful and productive." R. 79. Dr. Hyderi also noted that after Plaintiff completed a previous substance abuse rehabilitation program she "was sober for 7 years," and during that "sober" time she had her own business and "went to work, had a car, house, everything, ha[d] basics of life." R. 80.

More importantly, the ALJ relied upon the consultative psychiatric examination of Dr. Moore, which was conducted shortly after Plaintiff completed the intensive outpatient program at CPC. Plaintiff had been discharged from CPC on November 12, 2004, and had resolved her substance use issues at that time, as a notation in her discharge report states "no continuing substance abuse treatment needed." The report further states that Plaintiff's goals relating to her "alcohol/drug problem" were "achieved." R. 138, 140. Moreover, when Dr. Moore examined Plaintiff on December 20, 2004, he noted that Plaintiff's substance abuse was in remission.

Plaintiff advised Dr. Moore that although she used marijuana until her hospitalization in 2004, she completed a program at CPC in 2004 and no longer had a problem with that substance. Thus, according to the evidence of record, Dr. Moore's examination was conducted during a period when Plaintiff was not using drugs.

      Plaintiff reported to Dr. Moore that on a daily basis she was able to "dress, bathe and groom herself ... cook and prepare food, do general cleaning, laundry, shopping, manage money, drive, and take public transportation." R. 102.  She further reported that she "[got] along with friends and family ... [and] spen[t] her days doing chores and watching television." *Id.*  In his examination, Dr. Moore found Plaintiff's manner of relating, social skills and overall presentation be adequate. R. 101.  Her thought processes were "coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking." *Id.*  Her mood was calm and she "appeared relaxed and comfortable." R. 102.  He estimated her intellectual functioning to be in the average range, and found her insight to be poor and her judgment to be fair. *Id.*

      Vocationally, Dr. Moore opined that Plaintiff was "capable of understanding and following simple instructions and directions ... performing simple and complex tasks with supervision and independently ... maintaining attention and concentration for tasks ... regularly attend[ing] to a routine and maintain[ing] a schedule ... learning new tasks ... making appropriate decisions [and]  ... relat[ing] and interact[ing] appropriately with others." *Id.*  He noted that Plaintiff appeared "to have difficulty dealing with stress." *Id.*  Overall, Dr. Moore found that the "[r]esults of his examination appear[ed] to be consistent with psychiatric problems," but these psychiatric problems did "not appear significant enough to interfere with the claimant's ability to function on a daily basis." R. 102.

Also alluded to by the ALJ is the Psychiatric Review Technique ("PRT") and Mental Residual Functional Capacity Assessment ("MRFCA") that was completed by Dr. Janice Drucker shortly after Dr. Moore's examination. The PRT concludes that Plaintiff had only mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence and pace. The MRFCA, dated January 20, 2005, concludes that Plaintiff is "not significantly limited" in any of the twenty different abilities evaluated by the Assessment. Dr. Drucker concluded that Plaintiff was able to "understand, remember and carry out instructions, sustain att[ention]/conc[entration], relate to coworkers/supervisors, [and] adapt to changes in work environment." R. 106.

Based on this evidence from a period when Plaintiff was not using drugs, the ALJ concluded that if Plaintiff would not be disabled absent her use of drugs. The Court finds, contrary to the arguments of Plaintiff, that the ALJ's analysis was consistent with agency guidelines and supported by substantial evidence the record.

Last, Plaintiff challenges the ALJ's finding that Plaintiff retains the capacity to return to her past relevant work. Plaintiff's most recent past relevant work was in motorcycle sales. R. 47, 177, 178. She did this from 1992 to 1999. R. 47. According to Plaintiff, in this position, she did not use machines, tools or equipment, did not use technical knowledge or technical skills and did not do writing or complete reports. She did not supervise others nor was she a lead worker. R. 47-48. As defendant points out, the U.S. Department of Labor's Dictionary of Occupational Titles classifies the occupation of motor vehicle sales (including motorcycles) as semi-skilled light work. As the evidence described above shows, the record in this case contains substantial evidence to support the ALJ's conclusion that Plaintiff, absent substance use,

retained the capacity to perform her past relevant work, either as it was actually performed by her or as it is generally performed in the national economy.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ's findings are supported by substantial evidence, and thus affirms the Commissioner's final decision denying benefits for Plaintiff. An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: December 16, 2008